**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**HELEN G. LUCERO**, individually, and as
surviving spouse and personal representative of
the **ESTATE OF ALBERT LUCERO**,

      Plaintiffs,

  vs.                          No.    **CIV 01-0854 MCA/JHG (ACE)**

**JERRY DEAN POWER**,
**CANDY APPLE AMUSEMENT**, and
**ACE AMERICAN INSURANCE**,

      Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the *Motion for Partial Summary Judgment on the Issue of Wrongful Death and Derivative Claims* [Doc. No. 34] filed by Defendants Jerry Dean Power, Candy Apple Amusement, and ACE American Insurance on March 8, 2002, and the *Motion for Summary Judgement on the Issue of Loss of Income or Lost Earnings* [Doc. No. 40] filed by Defendants Jerry Dean Power, Candy Apple Amusement, and ACE American Insurance on March 27, 2002. Having considered the pleadings of record, the relevant law, and otherwise being fully advised in the premises, the Court finds grounds for **GRANTING** the *Motion for Summary Judgement on the Issue of*

*Loss of Income or Lost Earnings* and **DENYING** the *Motion for Partial Summary Judgment on the Issue of Wrongful Death and Derivative Claims*.

## I.  BACKGROUND

This civil action arises from a motor-vehicle accident that occurred on or about July 28, 2000, on Highway 54 between Vaughn and Santa Rosa, New Mexico.  During that accident, an automobile driven by Albert Lucero collided with a double tractor-trailer rig driven by Defendant Power.  At the time of the collision, Defendant Power was attempting to make a U-turn on Highway 54, and his tractor-trailer rig was driving across both lanes and shoulders of Highway 54.  Plaintiffs Helen G. Lucero, Ester Lucero Vaca, Guadalupe Vaca, Krystal Vaca, and Kristen Vaca were passengers in Mr. Lucero's vehicle at the time of the collision.  All of the Plaintiffs claim that they sustained injuries as a result of the accident.  On December 10, 2000, Albert Lucero died.

On July 24, 2001, this action was removed to this Court pursuant to 28 U.S.C. § 1441, based on this Court's diversity jurisdiction under 28 U.S.C. 1332, which is uncontested. [Doc. No. 1, 56.]  On March 14, 2002, the Court dismissed the claims involving Plaintiffs Ester Lucero Vaca, Guadalupe Vaca, Krystal Vaca, and Kristen Vaca, pursuant to the parties' *Joint Motion to Dismiss.*  [Doc. No. 33, 36.]  As a result, the damages that these particular Plaintiffs allegedly sustained as a result of the accident are no longer at issue. What remains to be decided are the claims of Helen Lucero, individually and as surviving spouse and personal representative of the Estate of Albert Lucero.  Hence, all further references to "Plaintiff" in the singular form refer to Plaintiff Helen Lucero.

Defendants have filed two summary-judgment motions with regard to the claims that remain pending. One of these motions asserts that Defendants are entitled to partial summary judgment on Plaintiff's claims for lost income and lost earnings of Albert Lucero. The grounds for this motion are that Albert Lucero reported no income in the tax years preceding his death and was not employed for at least ten (10) years prior to the accident. In response to this motion, Plaintiff has not offered any evidence to support a claim for lost income or lost earnings of Albert Lucero.

Defendants' other summary-judgment motion concerns Plaintiff's claim for the wrongful death of Albert Lucero and all other claims which derive from that wrongful-death claim. According to Defendants, Plaintiff cannot meet her burden of proof at trial with respect to these claims because she lacks evidence to show that the motor-vehicle accident on July 28, 2000, was the proximate cause of Albert Lucero's death. Plaintiff disputes that such evidence is lacking.

The focus of the undisputed facts and evidence submitted with the parties' briefs concerning the issue of proximate cause is the deposition testimony of three physicians: Ambrose Aboud, M.D., Ezra El-Kayam, M.D., and Howard Lee, Jr., M.D. This deposition testimony, along with the undisputed facts and other evidence submitted by the parties, can be summarized in the light most favorable to Plaintiff as follows.

Dr. Aboud is licensed to practice medicine in Texas, and his specialties are internal medicine, medical oncology, and hematology. (Aboud Dep. at 3.) Dr. El-Kayam is also a licensed physician; the focus of his practice is adult neurology. (El Kayam Dep. at 6-8.) Dr.

Lee is a neurological surgeon. (Lee Dep. at 3.) None of these three physicians treated Mr. Lucero at the time of the motor-vehicle accident on July 28, 2000, and Dr. Aboud is the only one of the three physicians who treated Mr. Lucero prior to that accident.

Dr. Aboud first saw Mr. Lucero in 1994, when Mr. Lucero was complaining of severe back pain. (Aboud Dep. at 6.) At that time, Dr. Aboud recommended back surgery, which Mr. Lucero ultimately received. (Id. at 7.) Dr. Aboud also visited with Mr. Lucero between 1997 and 1999. During one of those visits, Mr. Lucero was complaining of chest pain. (Id.) That visit resulted in a diagnosis of obstructive airways disease and sleep apnea. Dr. Aboud's examination and testing during the period from 1994 to 1999 did not, however, result in a diagnosis of coronary artery disease, diabetes, or hypertension. (Id. at 7-9.)

Dr. Aboud next saw Mr. Lucero when he was admitted to the hospital on or about November 12, 2000. (Aboud Dep. at 10-11.) On that date, Dr. Aboud called in Dr. Lee for a consultation. (Lee Dep. at 4.) During their initial examination, Dr. Aboud and Dr. Lee spoke to Mr. Lucero, as well as his spouse and daughter, regarding Mr. Lucero's symptoms and history, including the injuries he sustained in the motor-vehicle accident on July 28, 2000. (Aboud Dep. at 10-11, 13-14; Lee Dep. at 5-6.)

The deposition testimony of Mr. Lucero's spouse and daughter, who were also involved in the accident, indicates that Mr. Lucero was bleeding from his mouth and nose after the accident (E. Vaca Dep. at 20; H. Lucero Dep. at 25), and that the bleeding continued for several months after the accident (E. Vaca. Dep. at 29). During those months, Mr. Lucero reported that his mouth or face area was hurting and that his front teeth were

loose or sensitive.  He saw a dentist for these conditions.  (E. Vaca. Dep. at 30; H. Lucero Dep. at 28.)

Some weeks after the accident, Mr. Lucero began to report headaches.  (E. Vaca Dep. at 31.)  In or about November 2000, Mr. Lucero began vomiting and reported that his headaches were becoming more severe.  (E Vaca Dep. at 30-31; H. Lucero Dep. at 32.) These symptoms reportedly continued for about one to three weeks before Mr. Lucero was taken to a hospital in El Paso, Texas later that month.  (E. Vaca Dep. at 30-31; H. Lucero Dep. at 32-33.) Dr. Aboud testified that Mr. Lucero became comatose within about 48 hours of his admission to the hospital (Aboud Dep. at 13), and his condition "went down progressively" until his death on December 10, 2000 (Id. at 15.)

Dr. El-Kayam first saw Mr. Lucero in the hospital on November 13, 2000, at which time Mr. Lucero was in a state of "obtundation," which Dr. El-Kayam defined as "like a state of coma," such that Mr. Lucero "could not communicate at all."  Dr. El-Kayam was "called in" because Mr. Lucero had a "generalized seizure" the previous evening, as well as neurological deficits.  (El Kayam Dep. at 8-9.)  The "main reason" Dr. El-Kayam was consulted was to treat Mr. Lucero for his seizure.  (El Kayam Dep. at 39.)  Within an hour of Dr. El-Kayam's examination, Mr. Lucero's condition deteriorated further, requiring oxygen.  (El-Kayam Dep. at 8-9.)

The diagnostic studies that the physicians ordered during their examinations of Mr. Lucero included a radiological test called an angiogram, X-rays, an electroencephalogram or "EEG," an "MRI," and computer tomography of Mr. Lucero's brain, also known as a

"CAT scan." (Aboud Dep. at 10; El-Kayam Dep. at 10, 19, 32-33; Lee Dep. at 7-9, 12.) According to Dr. El-Kayam, the CAT scan showed a number of injuries or lesions. In Dr. El-Kayam's opinion, the "most important" of these injuries was a "subacute subdural hematoma," which he defined as a hemorrhage in the brain. (El-Kayam Dep. at 10.) Dr. Aboud also testified that, after discussing the matter with Dr. El-Kayam, Dr. Lee, and the radiologist who read the CAT scan, their collective diagnosis was that Mr. Lucero had a subdural hemorrhage, which Dr. Aboud defined as a hemorrhage between the brain and the skull bone. (Aboud Dep. at 10-12.)

According to Dr. El-Kayam, the CAT scan also indicated the presence of another type of hemorrhage in the brain, which he called a "diffuse subarachnoid hemorrhage." In addition, Dr. El-Kayam testified that the angiogram showed an aneurysm, or "ballooning of the artery," located in the Circle of Willis, which Dr. El-Kayam described as a network of arteries deep within the brain. (El-Kayam Dep. at 10, 18-19, 29-31.) Dr. El-Kayam opined that the subarachnoid hemorrhage more than likely came from the aneurysm, and that the aneurysm probably ruptured due to high blood pressure. (Id. at 18-19, 29-31.) Dr. El-Kayam did not attribute the aneurysm, the subarachnoid hemorrhage, or the subdural hemorrhage to the motor-vehicle accident on July 28, 2000. (Id. at 11, 26-28.) Rather, he opined that the aneurysm was more likely to be a congenital abnormality, (Id. at 27) and that Mr. Lucero's death probably was caused by a combination of his hypertension or high blood pressure, diabetes, the subarachnoid hemorrhage, a bad pneumonia, and morbid obesity (Id. at 12). He did not believe the subdural hemorrhage was caused by the motor-vehicle

-6-

accident because the CAT scan showed recent bleeding in that area which, in Dr. El-Kayam's opinion, was not consistent with an injury that occurred several months earlier. (Id. at 28.)

Dr. Aboud reached a different conclusion. He testified that, to a reasonable degree of medical probability, Mr. Lucero's death was caused by a condition or conditions resulting from the motor-vehicle accident that occurred in July 2000. (Aboud Dep. at 16-17.) Specifically, Dr. Aboud opined that "the primary cause of the death was subdural hemorrhage." (Id. at 17.) He respectfully disagreed with Dr. El-Kayam's explanation of why the motor-vehicle accident was not likely to be the cause of the subdural hemorrhage. (Id. at 24-25.)

In his deposition testimony, Dr. Lee also stated an opinion that is not consistent with Dr. El-Kayam's explanation of the subdural hemorrhage. Dr. Lee performed surgery on Mr. Lucero on November 14, 2000. (Lee Dep. at 11.) During the surgery, Dr. Lee noted that a "straw-colored fluid" came out when the covering of the brain was opened. In Dr. Lee's opinion, this fact "means that the subdural [hemorrhage] had been there for some time." He explained that:

> it's not uncommon for elderly people to have a brain injury, develop a chronic subdural hematoma, and then, as the blood vessels in the chronic subdural hematoma become attenuated, they rupture and bleed inside the chronic subdural hematoma, and given the appearance, maybe on a test of a CAT scan or MRI as being acute or subacute, that's when they present with the symptoms.

(Id. at 15.) Based on what he found at the surgery, Dr. Lee opined that "this was most likely --the origin of this, in all reasonable medical probability, stem[s] from his accident back in July 2000." (Id. at 16.)

Later in his deposition, Dr. Lee was asked: "Would you agree that the subdural hematoma and the subarachnoid hemorrhage that Mr. Lucero suffered could have been caused by the rapid deceleration head injury with sudden brain and artery movement?" His response was as follows: "I do think--I mean, I would strongly suspect that, given the facts that you've given me, that in all reasonable medical probability he could have started his, you know, chronic subdural hematoma, and I mean its origin." (Lee Dep. at 20.)

## II.     ANALYSIS

### A.     Standard of Review

Summary judgment under Fed. R. Civ. P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ." Fed. R. Civ. P. 56(e). Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Id. Judgment is appropriate "as a matter of law" if the non-moving party has failed to make an adequate showing on an essential element

of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

It is not the Court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999); Lopez, 172 F.3d at 759.

### B.     Wrongful Death and Derivative Claims

Defendants assert that they are entitled to summary judgment on Plaintiff's wrongful-death claim, and all other claims which derive from the wrongful-death claim, because Plaintiff lacks the admissible evidence necessary to meet her burden of proving that the motor-vehicle accident on July 28, 2000, was the proximate cause of Albert Lucero's death on December 10, 2000.  In particular, Defendants point to Dr. El-Kayam's opinion that the motor-vehicle accident was not the cause of the hemorrhages in Mr. Lucero's brain.  They also contend that Dr. Aboud's opinion to the contrary is inadmissible because Dr. Aboud allegedly lacks the qualifications necessary to meet the standard for expert testimony articulated in Daubert v. Merrell Dow Pharmaceutical, Inc., 509 U.S. 579 (1993).[1]

---

[1] In addition to their summary-judgment motions, Defendants have filed a *Motion to Strike the Testimony of Ambrose Aboud, M.D.* [Doc. No. 38] on the grounds that Dr. Aboud lacks the training and expertise necessary to render an admissible expert opinion regarding the proximate cause of Mr. Lucero's death.  The Court will address that motion separately at the pretrial conference in

Plaintiff does not dispute the proposition that proximate cause is a necessary element of her wrongful-death claim, which must be shown as a reasonable medical probability. See generally Alberts v. Schultz, 1999-NMSC-015, ¶¶ 27-29, 126 N.M. 807, 975 P.2d 1279 (citing NMUJI 13-305 1998). Plaintiff maintains, however, that the evidence submitted with her response to Defendants' motion is sufficient to prove this element of her claims, at least for the purpose of defeating summary judgment under Fed. R. Civ. P. 56.

The Court agrees. Even assuming for purposes of analysis that Dr. Aboud is not qualified to render an admissible expert opinion on the issue of whether the motor-vehicle accident on July 28, 2000, was the cause of Mr. Lucero's death, Defendants have asserted no grounds for excluding Dr. Aboud's testimony regarding other aspects of his role as a treating physician. That testimony, combined with the expert opinion of Dr. Lee, is sufficient to create one or more genuine issues of material fact which preclude summary judgment in Defendants' favor.

In particular, the testimony of Dr. Aboud and Dr. Lee calls into question some of the factual premises on which Dr. El-Kayam based his opinion that the motor-vehicle accident was not likely to be the cause of Mr. Lucero's death. While Dr. El-Kayam reasoned that the subdural hemorrhage probably was caused by more recent trauma because the CAT scan indicated fresh bleeding (El-Kayam Dep. at 28), Dr. Lee reached a different conclusion based on his observation of the straw-colored fluid during surgery and his reasoning that the

---

accordance with the framework set forth in United States v. Turner, 285 F.3d 909, 912-13 (10th Cir. 2002).

fresh bleeding observed on the CAT scan or MRI is not necessarily inconsistent with a chronic subdural hematoma that has existed for weeks or months (Lee Dep. at 14-16).

While Dr. El-Kayam only examined Mr. Lucero after he became comatose and unable to communicate (El-Kayam Dep. at 9), Dr. Aboud and Dr. Lee began their examinations when Mr. Lucero was still able to talk and provide information about his history and symptoms (Aboud Dep. at 10-11, 13-14; Lee Dep. at 5-6).  Accordingly, Dr. El-Kayam was operating under the assumption that the accident occurred on June 28 rather than July 28 (El-Kayam Dep. at 11-12, 36), and that Mr. Lucero had been under treatment for diabetes and high blood pressure (El-Kayam Dep. at 14, 37).  Dr. Aboud, on the other hand, testified that he had not diagnosed Mr. Lucero with diabetes or hypertension prior to the accident (Aboud Dep. at 8-9), and that he was operating on the assumption that the accident occurred on July 28, 2000 (Aboud Dep. at 9-10).

Further, while Dr. Aboud testified that he would defer to the opinions of Dr. El-Kayam and Dr. Lee regarding the cause of Mr. Lucero's brain injury (Aboud Dep. at 19-20), Dr. El-Kayam's testimony indicates that he was relying in part on information about Mr. Lucero's history and symptoms provided by Dr. Aboud (El-Kayam Dep. at 14, 37), and that a neurosurgeon (such as Dr. Lee) would be the type of physician most qualified to discuss aneurysms, subdural hematomas, or subarachnoid hemorrhages as they relate to trauma (El-Kayam Dep. at 18-19, 34, 46).  Of the three physicians whose deposition testimony is provided with the parties' briefs regarding Defendants' summary-judgment motion, Dr.

Aboud is the only one who diagnosed and treated Mr. Lucero prior to his admission to the hospital in November 2000, and Dr. Lee is the only one who is a neurosurgeon.

For purposes of analyzing Defendants' summary-judgment motion, each physician's deposition testimony must be viewed in the light most favorable to Plaintiff. See Hunt, 526 U.S. at 551-52; Lopez, 172 F.3d at 759. Viewing Dr. Lee's testimony in this light, as well as the portions of Dr. Aboud's testimony which are not subject to Defendants' Daubert motion, Plaintiff has met her burden of showing one or more genuine issues of material fact as to the cause of Mr. Lucero's death. Therefore, Defendants' ***Motion for Partial Summary Judgment on the Issue of Wrongful Death and Derivative Claims*** must be denied.

### C. Lost Income and Lost Earnings

The Court reaches a different conclusion with respect to Defendants' ***Motion for Summary Judgment on the Issue of Loss of Income or Lost Earnings***. In support of this motion, Defendants have presented evidence that Albert Lucero reported no income in the tax years preceding his death and was not employed for at least ten (10) years prior to the accident. Plaintiff offers no evidence to the contrary. Plaintiff's only argument is that Defendants' motion was filed after the deadline imposed by the Court's scheduling order. Defendants explain, however, that the delay in filing their motion was caused by a delay in receiving records from the Internal Revenue Service (IRS). As Plaintiff now readily admits that she will not claim loss of income or loss of earnings, the Court finds that the delay in the filing of Defendants' motion does not provide sufficient grounds for denying that motion.

Accordingly, Defendants are entitled to partial summary judgment with respect to Plaintiff's claims for loss of income or loss of earnings of Albert Lucero.

### III.   CONCLUSION

For the foregoing reasons, Defendants are entitled to partial summary judgment on Plaintiff's claims for lost income or lost earnings of Albert Lucero, but the presence of one or more genuine issues of material fact precludes this Court from granting partial summary judgment in Defendants' favor on any other aspect of Plaintiff's claims regarding the wrongful death of Albert Lucero.

**IT IS, THEREFORE, ORDERED** that Defendants' *Motion for Partial Summary Judgment on the Issue of Wrongful Death and Derivative Claims* [Doc. No. 34] be and hereby is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' *Motion for Summary Judgement on the Issue of Loss of Income or Lost Earnings* [Doc. No. 40] be and hereby is **GRANTED**.

**SO ORDERED**, this 31st day of December, 2002, in Albuquerque, New Mexico.

　

**M. CHRISTINA ARMIJO**
United States District Judge